# JUNE TERM, 1869.

## Fuss vs. Fuss and others.

*Post-nuptial contract—Change of domicil—Future acquisitions.*

1. Where there was a post-nuptial contract, as to property, between persons domiciled in Prussia, and married there, who then owned no property elsewhere, and do not appear to have contemplated a change of domicil, and the contract does not indicate any intention to control by it future acquisitions in any foreign state: *Held*, that land acquired in this state by the parties, after becoming domiciled here, and held and owned by the husband in his own name, was subject to be disposed of by him, by will or otherwise, *according to the laws of this state*, and the widow's rights therein were not to be determined by such contract.

2. The fact that such land was purchased with funds derived from the wife is no sufficient ground for setting aside the husband's will, devising it to her during her life-time, with remainder to other parties than her heirs; ample provision being made for her support.

APPEAL from the Circuit Court for *Milwaukee* County.

The plaintiff, *Anna Maria Fuss*, was married to John W. Fuss, in Prussia, some time prior to November 14, 1841, both of them being residents and citizens of that country. On that day they executed, in due form, according to the laws of Prussia, instruments in writing, whereby each granted and transferred to the other all real and personal property which should belong to the donator on the day of his or her death, which constituted a valid post-nuptial contract. Plaintiff owned at

that time real estate in Prussia, over which, by the laws of that kingdom, she had full control and right of disposal. In 1844 this property was sold, the husband taking possession, in fact, of the money; and they removed to this state, where he purchased one hundred and sixty acres of land in Waukesha county, on which he and the plaintiff lived until his death. In 1856 he acquired thirty acres of land in said county by inheritance from his father, of which he remained seized at his death. He was also possessed at his death of some $1,500 worth of personal property, which he claimed to own. In 1864 said John W. Fuss died testate, leaving all his real and personal estate to his wife during her life-time, and devising and bequeathing the same, after her death, to *Joseph W. Fuss* and four others, brothers and sisters of said deceased, who, with the executor, are made defendants to this action.

The complaint, in addition to the above facts, alleges that, at the date of said post-nuptial contract, plaintiff's real and personal property in Prussia was worth about $1,500, while her said husband had no property, except such sums as he might earn from day to day by his personal labor; that, from the sale of her said real estate in 1844, plaintiff received the sum of $1,400, which sum she intrusted to him (her husband), as her agent, and merely with authority to keep it safely for her; that, by the laws of Prussia, said money remained and was her own; that the purchase-money of the land in Waukesha county, to wit, the sum of $500, was paid out of said money; that her husband managed the purchase, and attended to the making out of the papers, and took the title in his own name, but without the advice or consent of plaintiff, who could not speak English or read the papers; that all the cattle, farming utensils and improvements on said premises were paid for with her money; that the greater part of the personal property which the husband possessed and claimed to own at the time of his death was purchased directly with plaintiff's money, and

the rest with the products of the aforesaid one hundred and sixty acres of land. Plaintiff, therefore, claims that she is equitably entitled to said one hundred and sixty acres of land in fee simple, and to the whole of the personal property, and prays that the court may so adjudge. She also prays that said post-nuptial contract may be declared valid, and that specific performance thereof be awarded ; and that the defendants, claiming under said will, may be ordered to release and relinquish their said claims, etc. The answer denies these averments, and makes sundry allegations not necessary to be stated here.

The court found, *inter alia*, that, at the time plaintiff and her husband left Prussia, plaintiff had and owned, in her own right, about $800 in gold and silver coin, and her husband had and owned about $300 ; that the same were put in a bag together, and placed in the hands of the husband, who brought the same to America, and had possession thereof after they came to this state ; that the expenses of the journey, and also a part of their expenses after reaching this state, were paid out of said moneys, and about $500 of the same was used in purchasing a squatter's claim, or improvements, upon the one hundred and sixty acres of land above mentioned, which purchase included a yoke of oxen, a cow, a plow, and other chattels ; that said one hundred and sixty acres of land were afterward purchased of the United States by the husband with moneys received from his father, and the title taken in his own name, and held by him to the time of his death ; and that the other lands and personal property purchased and owned by him during his life, as mentioned in the complaint, were not acquired with funds belonging to the plaintiff. As conclusions of law, the court held, 1. That the said post-nuptial contract, on the part of said John W. Fuss, "was fully and lawfully revoked by him, by his last will and testament."* 2. That the moneys owned by

---

*It appears from the evidence that such instruments are revocable by either party under the law of Prussia ; but what acts will constitute a revocation, is not expressly stated. REP.

plaintiff at or before the time she left Prussia, on her arrival in this state, became the property of her husband by the laws of this state.    3. That there was no resulting trust in plaintiff's favor arising out of the facts proven.

Judgment for the defendants, from which plaintiff appealed.

It was proven at the trial that, at the time of the marriage of the plaintiff with John W. Fuss, and until the time of their emigration to this country, the Code Napoleon was in force in that part of Prussia where they resided ; and it was stipulated that any printed copy of that code might be used at the hearing in this court.

. *James S. Brown*, for appellant, after discussing the question whether there was any revocation by the deceased of the post-nuptial contract, argued that, before the passage of the Married Woman's Act, courts of equity in this state (as in the other states and in England), seized on every equitable circumstance to protect the wife in every right of property not fairly and distinctly surrendered by the marriage contract.    2 Story's Eq. Jur. §§ 1370–1375, 1380 ; *Dunkley v. Dunkley*, 13 Eng. L. & E. 318 ; *Barber v. Barber*, 21 How. (U. S.) 590. Equity will trace funds and property belonging to the wife into real estate, and give it to her as her equitable estate.    2 Story's Eq. Jur. §§ 1377, 1380 ; *Lathrop v. Gilbert*, 2 Stockt. Ch. 344 ; *Wickes v. Clarke*, 8 Paige, 161 ; 1 P. Wms. 264, n ; *Niemcewicz v. Gahn*, 3 Paige, 614 ; 1 Roper on H. & W. ch. 4, § 1 ; *Monday v. Waghorn*, 11 Eng. L. & E. 1.    2. Even the authorities most opposed to what we claim as the legal effect of a foreign marriage concede that the *lex loci* governs as to property existing *before* the change of domicil.    2 Kent's Com. § 39, pp. 458, 459 ; Story's Conflict of Laws, §§ 276, 276a, 158, 159 ; *Anstruther v. Adair*, 2 Mylne & K. 513 ; *De Couche v. Savatier*, 3 Johns. Ch. 190 ; *Mostyn v. Fabrigas*, Cowp. 174 ; *Feaubert v. Trust*, Rob. App. Cases, 1 ; *Dues v. Smith*, Jacob, 544 ; Merlin's Repertoire, Communaute de Biens, § 1, art. 3 ; Story's Conflict

of Laws, §§ 145–147; Pothier's Traite de la Communaute, 10–14; *Saul v. Creditors*, 17 Martin (5 N. S.) 569, 605, 606; *Gale v. Davis' Heirs*, 4 id. 645; *Garnier v. Poydras*, 13 La. 177. But, by the Code Napoleon, in force in Prussia when these parties were married, and subsequently, the real estate owned by the wife at the time of the marriage continued to belong to her (§ 1404), although the income or rents thereof belonged to the *community* or partnership created by the marriage (§ 1401). The husband was required to keep a full inventory of the property of the community, and also of the separate property of the wife; and, if he failed to do so, she and her heirs, after a dissolution of the community, might prove what her property was, even by common rumor (§ 1415). He was his wife's administrator and agent, with the responsibilities of a trustee (§§ 1421, 1422, 1426–1428). 3. Before leaving Germany, and at the moment of leaving, the husband held at least over $800 as trustee for his wife, under the Code Napoleon. Mixing his own funds in the same bag with these trust funds did not exonerate him from the trust. He purchased the one hundred and sixty acres with a part of this fund, paying $500 for it. By the policy of Wisconsin and other states, at least in courts of chancery, all rights of the wife were protected, and wherever the husband, either directly or impliedly, had assumed the character of trustee for his wife, courts of chancery would trace her money into real estate or otherwise, and enforce the trust. 2 Story's Eq. Jur. §§ 1378, 1380; *Lathrop v. Gilbert*, 2 Stockt. Ch. 344; *Mews v. Mews*, 21 Eng. L. & E. 556. Besides, under the Territorial Statutes of 1839, in force in 1844, the equitable doctrine of a resulting trust in favor of the person whose money was paid for the land was saved, although it was destroyed by the subsequent statutes of 1849. Ter. Stat. 1839, p. 162, § 7; Story's Eq. Jur. §§ 1196–1201. By the purchase of the one hundred and sixty acres of land

with the wife's funds, therefore, she became the equitable owner. If it was necessary afterward to pay $100 to the state, and $100 to the United States, to perfect the title, he had over $300 of the trust fund still in his hands. Once having become trustee for his wife, he was bound to protect the purchase, and buy in all outstanding titles to perfect her title. If he could account for the balance of the trust funds in his hands, and could show that he expended his own money in the subsequent purchase, the amount expended might be a charge against the trust; but, under no circumstances, can a trustee deal for his own benefit with the trust property, or cut off the title of a *cestui que trust* by purchasing an outstanding title. 2 Story's Eq. Jur. §§ 1211, 1211a, 1212 ; *Down v. Down*, 2 How. (Miss.) 915 ; *Van Epps v. Van Epps*, 9 Paige, 237.

*Edward Salomon*, on the same side, contended, 1. That the post-nuptial contract, or mutual donation, made between plaintiff and her husband in Prussia, was valid ; and, not being in conflict with our laws, will be executed here. Story on Conflict of Laws, §§ 183–189, 242, 244, 263, 276, 276a; *De Couche v. Savetier*, 3 Johns. Ch. 190 ; Code Napoleon, §§ 931, 932, 1094, 1096, 1097. 2. That the will of John W. Fuss did not operate as a revocation of said contract. [The argument of counsel on this point is omitted.] 3. That, independently of that contract, plaintiff was entitled in equity and good conscience to a large portion of the property of her deceased husband, as absolutely her own. Marrying without marriage settlement, their personal property, future acquisitions and fruits of real property went into the *community*. Their real property does not go into the community, nor would a sale of it change their rights. The husband had the management of the property of the community, and of the real estate of the wife. Code Napoleon, §§ 1401, 1404, 1421, 1433. Over $800 of the property which the husband had when they left Germany, was the property of his wife, and he held it for her as

trustee.   When he came to Wisconsin, with that money in his possession, the title to it did not change.   It is true, under the laws of Wisconsin, he was entitled to her personal property; but this money was in equity not personal property; it was the same as real estate, being its proceeds, which equity will follow and treat as real estate.   Under the Code Napoleon, which entered into their marriage contract as a part thereof, he or his estate had to account for this money to his wife; charged with that trust, the deceased brought his money here, and invested it partly in this real estate.   He would have had enough, and more, to pay for the land, had he not wrongfully spent the rest of his wife's money.   She is now entitled to follow this, her separate property, the trust estate, and is therefore entitled at least to this one hundred and sixty acres of land.   2 Story's Eq. Jur. §§ 1391, 1395, 1201, 1210–1212; Story's Conflict of Laws, §§ 183–189; 1 Lead. Cas. in Eq. 414, 396, 200, 201, 203, 204; 2 Spence's Eq. Jur. 204.

*Levi Hubbell*, for respondents, contended, 1. That the post-nuptial contract was revoked by the will of John W. Fuss.   2. That although plaintiff, while she remained in Prussia, may have been the owner of the money derived from her real estate, yet when she fixed her domicil, with her husband, in Wisconsin, where the laws made the personal property of the wife the property of the husband, she could no longer assert any right to it under the laws of Prussia. 2 Story's Eq. Jur. §§ 1402, 1403; *Ellsworth v. Hinds*, 5 Wis. 626.   There is no controversy as to this doctrine in the courts of this country.   The case of *Dacouche v. Savetier* (3 Johns. Ch. 190) was one of express contract, and has no bearing on this point.   3. The plaintiff, however, may claim that, inasmuch as her husband became possessed of, and used, property which was originally hers, she shall have a "suitable provision" out of his estate.   But such provision is made by the will.

[The arguments of counsel on both sides, on some other points involving controverted questions of fact, are omitted.]

DIXON, C. J.   Judge STORY, in his Conflict of Laws (§ 143), speaking of contracts between husband and wife in respect to their property, says : " Where there is an express nuptial contract, that, if it speaks fully to the very point, will generally be admitted to govern all property of the parties, not only in the matrimonial domicil, but in every other place, under the same limitations and restrictions, as apply to other cases of contract.   But where there is no express nuptial contract at all, or none speaking to the very point, the question what rule ought to govern, is surrounded with more difficulty."   The learned commentator then proceeds to examine the question at much length, quoting the opinions of eminent jurists both at home and abroad, and concludes (in §§ 184, 185, 186 and 187) by laying down, among others, the following propositions, which, he says, although not universally established or recognized in America, have much of domestic authority for their support, and none against them.

" (1) Where there is a marriage between parties in a foreign country, and an express contract respecting their rights and property, present and future, that, as a matter of contract, will be held equally valid every where, unless, under the circumstances, it stands prohibited by the laws of the country where it is sought to be enforced. It will act directly on movable property every where. But as to immovable property in a foreign territory, it will, at most, confer only a right of action, to be enforced according to the jurisprudence *rei sitæ*.

" (2) Where such an express contract applies in terms or intent only to present property, and there is a change of domicil, the law of the actual domicil will govern the rights of the parties as to all future acquisitions.

" (3) Where there is no express contract, the law of

the matrimonial domicil will govern as to all the rights of the parties to their present property in that place, and as to all personal property every where, upon the principle that movables have no *situs*, or, rather, that they accompany the person every where. As to immovable property, the law *rei sitæ* will prevail.

"(4) Where there is no change of domicil, the same rule will apply to future acquisitions as to present property. (5) But where there is a change of domicil, the law of the actual domicil, and not of the matrimonial domicil, will govern as to all future acquisitions of movable property; and, as to all immovable property, the law *rei sitæ*."

*Murphy's Heirs v. Murphy* (1 La. Cond. R. 341) is an adjudication illustrating and fully sustaining the first proposition laid down by Judge STORY. There was an express contract respecting the rights and property of the parties, even though they should afterward reside in countries where different laws should prevail.

*Castro v. Illies* (22 Texas, 479) is an authority which in like manner illustrates and sustains the second proposition, as also the others; and the doctrines of that case are supported by the decisions in *Le Breton v. Miles*, 8 Paige, 261; *Gale v. Davis's Heirs*, 1 La. Cond. R. 312; and *Saul v. His Creditors*, 5 Martin (N. S.), 569, 604, 605. The opinion of Judge PORTER, in the latter case, is a very full and able discussion of the questions.

Speaking of the decisions in Louisiana, Judge STORY (§ 183) says the doctrines there maintained will, most probably, form the basis of American jurisprudence on this subject; that they have much to commend them in their intrinsic convenience and certainty, as well as in their equity; and they seem best to harmonize with the known principles of the common law in other cases.

This case falls clearly within the second proposition above laid down. There is nothing in the contract which "speaks fully to the very point"—nothing which manifests any intention in the parties to regulate or con-

trol by it, and according to the laws of their matrimonial domicil, their future acquisitions and gains of property in any foreign state or territory, or any property which should be held or owned by them in such state or territory. The contract was obviously made with reference to its operation and effect within the kingdom of Prussia upon the property of the parties situated there, and with no reference to property situated elsewhere. It appears that they had no property elsewhere, and there is no ground for supposing that they at that time contemplated any change of domicil, or a removal to this country or any other. The contract, to have operated upon the rights of the parties abroad, must have been made with express reference to such operation.

The real property, therefore, in this state, acquired by the parties after they came into it, and which was held and owned by the husband in his own name, was subject to be disposed of by him, by will or otherwise, according to the laws of this state.

The other point urged, as to the equity of the plaintiff to maintain this action because the lands in question were purchased with the money of the plaintiff, or the proceeds of her estate in Prussia, is sufficiently answered by the fact that under the will she has all the real and personal estate whatever of the testator, her deceased husband, during her life-time. There is no pretense that such is not a full and ample provision for her support and maintenance ; and this being so, she has no ground of complaint.

*By the Court.*— Judgment affirmed.