JOSEPH N. BESSE

v.

ALEXIS PELLOCHOUX *et al.*

1. ANTE-NUPTIAL CONTRACT—*effect when made in a foreign country.* Where there is a marriage between parties in a foreign country, and an express contract concerning their rights and property, present and future, that, as a matter of contract, will be held equally valid everywhere, unless, under the circumstances, it stands prohibited by the laws of the country where it is sought to be enforced. It will act directly on movable property everywhere, but as to immovable property in a foreign territory, it will, at most, only confer a right of action, to be enforced, according to the jurisprudence *rei sitæ.*

2. Where such an express contract applies, in terms or intent, only to present property, or is to be performed only in the country where made, and there is a change of domicil, the law of actual domicil will govern the rights of the parties as to all future acquisitions.

3. Where an ante-nuptial contract was made between parties in Switzerland, in regard to property to be acquired during marriage, and it appeared that the contract contemplated no change of domicil, but was to be performed in the place where made, it was *held*, that it did not affect real estate acquired in this country by the husband after their emigration.

APPEAL from the Circuit Court of LaSalle county; the Hon. EDWIN S. LELAND, Judge, presiding.

Messrs. BICKFORD, BOWEN & MALONEY, for the appellant.

Messrs. BUSHNELL, BULL & GILMAN, for the appellees.

Mr. Justice Scott delivered the opinion of the Court:

In 1850, at the residence of the parties in Switzerland, appellant entered into an ante-nuptial agreement with Marie Elizabeth Pellochoux, whom he afterwards married. It was executed and attested with all the usual formalities, and was doubtless valid by the laws of the canton where it was made.

The three principal paragraphs are as follows:

"1st. The future husband associates and renders his future wife partaker of half the property acquired during their marriage.

"2d. The furniture of the contracting parties once inherited and inventoried, will be confounded and divisible into two equal parts, between the conjoints.

"3d. Joseph Nicolas Besse, as well for his wife, Marie Madeline Metroz, as himself, both present, and natives of Orsieres, where they now live, desiring to prove to the young couple their approval of re-union to be contracted, give to their son, Joseph Nicolas, half of their immovable as well as movable property, on the close conditions that the conjoints will work the other half still retained and belonging to said parents. The parents of the groom now forsake all claim to what they will acquire from this day in favor of the conjoints—the whole being gratefully accepted by the receivers.

"The parties, bringing a modification to clause No. 2, have agreed that the furniture inherited or now inherited will be divided the couple, without any regard to their production, from the time of their marriage.

"The bride's parents, both present, take upon themselves the obligation to leave their daughter Marie a share of their succession, equal to a share of each of the children of the same bed."

Other relatives were present, who made gifts to the bride and groom, but the givers reserved the possession during their lifetime.

Within a few years after their marriage, appellant and his wife came to this State. On their arrival in this country they

had no considerable property or money. The real estate in controversy was all acquired after the change of domicil, by their united industry, the title to which was taken in the name of appellant. In 1869 Marie Elizabeth died, never having had any children. Appellees are her heirs at law, being her brothers and sister. Under the provisions of the ante-nuptial contract, they claim they are entitled to one-half of all the property, both real and personal, acquired by appellant previous to the death of his wife.

The original contract is written in the French language, and if the translation found in the record is correct, it must be conceded there is much obscurity in its provisions. Appellees having presented it, the translation must be taken as correct, for the purposes of this decision.

The words that are supposed to create an estate in the wife equal to one half of all the property acquired during marriage, are of doubtful meaning. They have no definite signification, like well understood legal terms. The language is, he "associates and renders his future wife partaker of one-half the property acquired during marriage." How is she rendered "partaker?" Is she given the use of the property during the marriage relation, or is she to be invested with the title of an undivided half as of an absolute ownership? No words are used which, in their ordinary or legal import, define what estate she takes, and none are used that convey the idea the estate, whatever it is, shall descend to her heirs. If we concede the view of the law contended for, that the ante-nuptial contract is operative and binding as to property acquired after the change of the matrimonial domicil, the decision could be rested on the construction, it was only intended to make the wife " partaker " in the use of one-half of the property acquired during marriage, and that no intention was manifested to invest her with an estate of inheritance, in case she should die before her husband, that would descend to her heirs. This view is strengthened by reference to the 3d clause, where the parents of the groom give to their son, not to the future wife, one-half of their immovable and movable property, " on the

close conditions the conjoints will work the other half still retained and belonging to said parents."

It could not have been the intention to continue a community of interest between their son and the heirs of the future wife, in case she should die first.   The construction insisted upon would produce this result, however irrational it may appear to be.   But, independently of this construction of the contract, the law itself would not continue a community of interest between the husband and the heirs of his wife.   In *Murphy's Heirs* v. *Murphy*, 5 Martin, 83, it was decided, when persons intermarried in a country where the local laws create a community of goods, and remove to a country where that principle does not prevail, the community will not continue between the husband and their children after the death of the wife.

It will be observed, the parents of the bride take upon themselves the obligation to leave to their daughter Marie a share of their succession, equal to a share of their other children. This would clearly be the separate estate of the wife.   Thus it will be seen, when all the provisions of the instrument are read together, it was the intention the husband and wife should each have separate property.   It was so expressly stated in the contract. and what the husband rendered the wife "partaker" of, must have been the use of the property during the marriage relation, and not the absolute ownership of any distinct portion.

But, regarding the other construction as the true one, that the words "render her partaker," give the wife an undivided interest in all the property that should be acquired during marriage, still we do not see upon what principle the position assumed by counsel can be maintained.

The contract associating the parties thereto as joint partakers in the property to be acquired during marriage, does not specify any place where it is to be performed.   But we are not left in doubt on this point.   An examination of its provisions shows it could not be fully performed at any place other than the place where it was entered into, viz: at the place of the

matrimonial domicil. This is apparent from the provisions of the third paragraph.

But the property which is the subject of this litigation, was all acquired after the husband and wife had changed their domicil, and taken up their permanent abode in a country foreign to the matrimonial domicil. The question that presents itself is, whether the after acquired property will be affected by the provisions of the ante-nuptial contract, or whether the law of the actual domicil in a foreign country will govern as to all future acquisitions.

What effect is to be given to ante-nuptial agreements, where parties have changed their domicil and made new acquisitions, has been the subject of much discussion. There is great confusion and contradictory statements in the opinions of jurists, in all countries, on this question.

The general doctrine is, no doubt, as stated by the text writers: Where there is an express ante-nuptial contract, it will generally be admitted to govern all the property of the parties, not only in the matrimonial domicil but in every other place, unless it contravenes some law or principle of public policy of the country where it is sought to be enforced. Story Con. Laws, sec. 143; Wharton Con. Laws, sec. 197.

But, Mr. Justice Story adds: "Where there is no express nuptial contract at all, or none speaking to the very point, the question what rule ought to govern is surrounded with more difficulty." The author then enters upon an elaborate review of the whole subject, and among others reaches these conclusions:

"1st. Where there is a marriage between parties in a foreign country, and an express contract concerning their rights and property, present and future, that, as a matter of contract, will be held equally valid everywhere, unless, under the circumstances, it stands prohibited by the laws of the country where it is sought to be enforced. It will act directly on movable property everywhere, but as to immovable property in a foreign territory, it will, at most, only confer a right of action, to be enforced, according to the jurisprudence *rei sitæ.*

19—73D Ill.

"2d. Where such an express contract applies, in terms or intent only, to present property, and there is a change of domicil, the law of actual domicil will govern the rights of the parties as to all future acquisition." Story Con. Laws, secs. 184 and 185.

· The doctrine of the text has, for its support, the best considered cases on this subject, so far as we have examined them. In Louisiana, cases involving these principles have been the most elaborately discussed of any arising in this country. The jurisprudence of that State is founded on the principles of the French and Spanish laws, which create a community of interest between husband and wife as to all acquests and gains, and the frequent removals from and into States where that principle does not prevail, has produced litigation involving the principles we are considering. The decisions of the courts of that State evince great learning and research.

As was said in *Gale* v. *Davis' Heirs*, 4 Martin: "Though it was once a question, it seems now to be settled, that where a couple emigrate from the country where their marriage was contracted, into another, the laws of which are different, the property which they acquire in the place where they have moved is governed by the laws of that place."

This principle was again recognized in *Murphy's Heirs* v. *Murphy, supra*. This latter case is an authority for the first proposition cited from Judge Story's work. The second proposition rests upon the principle of *Gale* v. *Davis' Heirs, supra*, and *Saul* v. *His Creditors*, 5 Martin, (N. S.) 569.

The latter proposition might be somewhat more comprehensively stated. Not only where there is no contract speaking directly to the point, but where it clearly appears it was to apply to personal property only, or to be performed only in the country where made, and there has been a change of the matrimonial domicil, the law of the actual domicil will control as to all property thereafter acquired. Thus, in *Fuss* v. *Fuss et al.* 26 Wis. 256, where there was a post-nuptial contract as to property between persons married and domiciled in Prussia, who then owned no property elsewhere, and it did not appear

they contemplated a change of domicil, nor that there was any intention manifested to have it control property that might be acquired in any foreign country, it was decided the after acquired property, held in the name of the husband, was not affected by the contract, and was subject to be disposed of by him, by will or otherwise, according to the laws of the actual domicil.

The case of *Castro* v. *Illies*, 22 Tex. 479, is a well considered case, and announces a doctrine which has its foundation in reason as well as in natural justice, viz: Where there has been a change of domicil, though there be an express contract, if it do not expressly provide, or the intention be not manifest, it is to apply to and govern all after acquired property, wherever the parties may reside, it will not affect real property situated in a new domicil. The reasoning in *Saul* v. *His Creditors, supra,* is cited in support of this view of the law, to which may be added *LeBreton* v. *Myers,* 8 Paige, 261; *Kneeland* v. *Ensly,* Meigs' R. 620; *Gale* v. *Davis' Heirs, supra; Lyon* v. *Knott,* 26 Miss. 548.

In the case at bar there is nothing in the contract, "speaking to the very point," that manifests any intention that all future acquisitions of property in foreign countries should be controlled by it. It will bear no such construction. As before said, it appears, on the face of the agreement, it was to be and could not be fully performed elsewhere than in the canton where the parties resided, in Switzerland. When it was entered into it could not have been the intention to change their domicil, and it certainly never entered the minds of the parties it should affect the property that might thereafter be acquired in foreign countries.

The position of counsel is not strengthened by the allegation in the bill, that, by the force and effect of the contract, as construed by the laws of the canton where the contracting parties resided, Marie Elizabeth would be entitled to the undivided one-half of all the property which the husband then owned or should thereafter acquire during the marriage. It may be this would be the true construction had they remained in Switzer-

land, but, assuming the parties contracted with reference to the laws of their domicil, and that such laws entered into and formed a part of the contract itself, still, they could have no extra-territorial effect. Notwithstanding the local laws may form a part of the contract, the extent of those laws is limited to the dominion of the sovereign power that enacts it. It is not by virtue of the laws of a foreign State, but by comity that exists between nations, that an ante-nuptial contract, executed there, is allowed to control as to the acquisition of property over our customs and positive laws. No contract, either express or implied, can give to the local laws a more extended force than they really had. In all marriages, the parties may be presumed to tacitly adopt the laws of their domicil, and to agree to be governed by them, but the obligation will be limited by the extent of those laws. Construing this contract as though the local laws of the canton constitute a part of it, it will not be any more obligatory for that reason in another jurisdiction. Outside the territorial force of local laws, such implied or tacit contract would cease to control the acquisition of property in another country to which they might remove. The laws of the matrimonial domicil do not travel with the parties, and no contract can give them vitality or effective force here. No State is bound to admit the force of a foreign law as controlling within its jurisdiction. By comity we permit express contracts to have the same force and effect as in the countries where made, but not their local laws. *LeBreton* v. *Bouchet*, 3 Martin, 60.

We are of opinion our laws must govern as to property acquired by appellant and his wife during their residence in this State. There is no express contract to the contrary. The contract was manifestly to be performed in the canton where the parties were domiciled when they entered into it. It is local in its effect and operation, and it could not have been the intention it should control the acquisition of property at any other place than the matrimonial domicil. Appellant, having changed his domicil by the consent of his wife, as we must presume, the applicatory law also changes. In the absence of any ex-

press contract to the contrary, the law of the domicil of the husband governs as to the acquisition of property.

The decree will be reversed and the bill dismissed.

*Decree reversed.*